UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL LUBIN,

      Plaintiff,

v.

FCA US, LLC

      Defendant.

Case No. 20-cv-13233
Hon. Matthew F. Leitman

_____/

**ORDER (1) GRANTING IN PART AND DENYING WITHOUT
PREJUDICE IN PART DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (ECF No. 17); (2) DECLINING TO ORDER ADDITIONAL
DISCOVERY REQUESTED UNDER FEDERAL RULE OF CIVIL
PROCEDURE 56(D); (3) TERMINATING PLAINTIFF'S MOTION
TO STRIKE (ECF No. 24) AS MOOT; AND (4) GRANTING FCA LEAVE
TO FILE A SECOND MOTION FOR SUMMARY JUDGMENT**

In this action, Plaintiff Michael Lubin claims that his former employer, FCA

US, LLC, discriminated against him based on his age in violation of the federal Age

Discrimination in Employment Act, 29, U.S.C. § 621 (the "ADEA") and Michigan's

Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.* (the "ELCRA").

FCA has now moved for summary judgment on all of Lubin's claims.  For the

reasons explained below, FCA's motion is **GRANTED IN PART AND DENIED**

**WITHOUT PREJUDICE IN PART**.  In addition, the Court **DECLINES** Lubin's

request for additional discovery under Federal Rule of Civil Procedure 56(d) and

**TERMINATES** his motion to strike certain declarations from the record as moot.

1

# I

## A

FCA is one of the world's largest automakers.  In 1997, FCA hired Lubin as a "hi-lo supervisor." (Lubin Dep. at 40, ECF No. 17-2, PageID.134.)  Over the next several years, Lubin held a variety of positions at FCA. (*See*, *e.g.*, *id.* at 41-45, PageID.134-135.)  In 2010, Lubin began working as a buyer with Mopar Purchasing, the parts and service division of FCA. (*See id.* at 47-48, PageID.135.)  In that role, Lubin was responsible for purchasing electrical and packaging products FCA needed for servicing FCA vehicles. (*See id.* at 55, PageID.138.)

## B

From 2011 through 2016, Lubin reported to Greg Wise, Karen Hiatt, and Nikki-Debbs Watchowski. (*See id.* at 48, 55, 59, PageID.136, 138-139.)  During that time, FCA used an annual performance evaluation process called "Performance Leadership Management" ("PLM") for "certain management-level employees" like Lubin. (Declaration of Laura Verla, FCA Human Resources Business Partner, at ¶8, ECF No. 17-3, PageID.188.)   The PLM process provided both (1) "substantive comments regarding [an] employee's performance" and (2) "an overall PLM rating based on a nine box matrix" that took into consideration an employee's "performance and leadership skills." (*Id.*)  A "high" PLM rating was a 6, 8, or 9; a

2

"medium range score" was a 3, 5, or 7; and the "lowest scores" were 1, 2, and 4.[1]
(*Id.*) In 2011, Lubin received a "high" PLM score of 6. (*See* 2011 PLM Review,
ECF No. 17-5.) From 2012-2016, he consistently received 5 ratings. (*See* 2012-
2016 PLM Reviews, ECF Nos. 17-6 – 17-10.)

## C

In July 2016, Lubin began working as a buyer for a new project within Mopar
Purchasing known as "Magneti Marelli Offered by Mopar" or "MMOBM." (Lubin
Dep. at 91-97, ECF No. 17-2, PageID.147-148.) The "idea" for MMOBM was "to
start creating a division/branch of Mopar that would compete with" retail entities
like Pep Boys and O'Reilly's. (*Id.* at 92, PageID.147.) Lubin was one of two buyers
assigned to MMOBM. (*See id.* at 103, PageID.150.)

The MMOBM project did not succeed as Mopar Purchasing had hoped.
According to Lubin, the project was "poorly conceived" and struggled to get off the
ground. (*Id.* at 104, PageID.150.) In April 2017, Lubin became "concerned about
the lack of programs on the deck" at MMOBM and about the program's "unclear
expectations." (*Id.* at 102, PageID.150.) In addition, because of contracts put in
place in 2016, "there was nothing for purchasing to do for the entire year of 2017 in

---

[1] It may seem unusual that a PLM score of "6" is better than a score of "7," or that a
"4" is a worse score than a "3," but Laura Verla, an FCA Human Resources Business
Partner, confirmed that scoring system in her sworn declaration. (*See* Verla Decl. at
¶8, ECF No. 17-3, PageID.188.)

terms of [] workload." (*Id.*)  Lubin therefore "tried to find some things to do" and "tried to help other buyers." (*Id.* at 103, PageID.150.)  During his 2017 annual review, Lubin received his "first [ever] four" (*i.e.*, poor) rating since he had started working for Mopar Purchasing. (*See id.* at 91, PageID.487.)

### D

At some point in 2017, Lubin approached one of his supervisors, Jenea Goy, and told her that "the workload [was not] there anymore" for MMOBM to have two buyers. (*Id.* at 102-103, PageID.150.)  A different supervisor, Brett Hardy, ultimately told Lubin that "if anybody [was] going to leave [Mopar Purchasing], it [would] have to be [Lubin]." (*Id.* at 104-105, PageID.150.)

Lubin thereafter began searching for a new position at FCA.  During that process, he reached out to one of his prior supervisors, Karen Hiatt. (*See id.* at 106-107, PageID.151.)  Hiatt had previously moved from Mopar Purchasing to another FCA division called Indirect Purchasing. (*See id.* at 27, PageID.131.)  Lubin interviewed with Hiatt and ultimately assumed a "Senior Buyer B" position with Indirect Purchasing. (*Id.*; *see also id.* at 121, PageID.155.)  However, Lubin was concerned about his new position because it was "completely different" from what he had done before (*id.* at 110, PageID.152) and he had "no experience" for the job. (Lubin Decl. at ¶4, ECF No. 21-2, PageID.461.)  For her part, Hiatt believed that Lubin was "more than qualified to do the indirect purchasing job" (Hiatt Decl. at

¶18, ECF No. 21-6, PageID.547.) And despite feeling unqualified, Lubin felt like the new position met "his desire for a challenge." (Lubin Dep. at 111, ECF No. 17-2, PageID.152.)

When Lubin first began working in Indirect Purchasing, he reported to Hiatt, but not long after he started working in that department, Hiatt left FCA. (*See id.* at 26-27, PageID.131.)  Lubin then began reporting to Jim Greathouse. (*See id.* at 18, 121, PageID.129, 154.)   Several other "Senior Buyer B" employees that had a "comparable role" to Lubin also reported to Greathouse at that time. (*Id.* at 122, PageID.154.)   Those employees included Cheryl Bregin, Thomas Delanoy, and Doug Theisen. (*See id.* at 121-123, PageID.154.)   Bregin and Delanoy were "comparable in age to [Lubin]" and Theisen was older. (*Id.* at 143, PageID.160.)

## E

Lubin's transition to Indirect Purchasing was challenging.  In his 2018 annual review, Greathouse gave Lubin a "4" rating – Lubin's second consecutive poor rating.[2] (*See* 2018 PLM Review, ECF No. 17-13, PageID.336.)  In Lubin's review, Greathouse wrote that certain strategy presentations were "not complete," "sloppy," and "missing information." (*Id.*)  Lubin also received a "low" rating for "overall leadership." (*Id.*)  At this time same, Greathouse provided substantially better scores

---

[2] As described above, Lubin also received a "4" rating for his work in Mopar Purchasing in 2017.

and reviews to Delanoy (who received a "5" score) and Bregin (who scored an "8") – employees who, as described above, were of comparable age to Lubin. (*See* Greathouse Dep. at 170-171, ECF No. 17-12, PageID.324.)

On May 8, 2019, Greathouse placed Lubin on a 90-day "Performance Improvement Plan" (the "2019 PIP"). (*See* 2019 PIP, ECF No. 17-14.)  The 2019 PIP was "initiated" because Lubin had failed to "meet all of his performance or leadership objectives" for 2018. (*Id.*, PageID.341.)  Lubin completed the 2019 PIP in October 2019.  At that time, Greathouse concluded that Lubin had "taken the [2019] PIP seriously," had "ma[de] an effort to improve," and "met the minimum requirement for a Senior Buyer B." (*Id.*, PageID.350-351.)  Nonetheless, Greathouse also noted that Lubin was "not happy with his current role," and that while Lubin had "demonstrated improvement," it remained an open question whether Lubin could "sustain[]" that improvement over the "long term." (*Id.*)

In December 2019, Lubin complained to one of his supervisors, MaryAnn Kirsch, "that younger workers were being preferred by the company" and "younger employees were not being held to the same standards as us older ones." (Lubin Decl. at ¶¶ 19-20, ECF No. 21-2, PageID.462.)  Lubin says that "[t]o [his] knowledge, [his] complaints were] not investigated." (*Id.* at ¶21, PageID.462.)

**F**

Despite completing the 2019 PIP, Lubin received another "4" PLM rating from Greathouse during his 2019 annual review. (*See* ECF 2019 PLM Review, No. 17-16, PageID.360.)   Greathouse then placed Lubin into a second Performance Improvement Plan (the "2020 PIP"). (*See* Greathouse Dep. at 185-186, ECF No. 17-12, PageID.327-328; Varela Decl. at ¶12, ECF No. 17-3, PageID.190.)   Around this same time, Greathouse had several colleagues review Lubin's work and/or PLM evaluations. (*See* Greathouse Dep. at 88-90, 132-133, 186-187, ECF No. 17-12, PageID.303-304, 314, 328.)   Greathouse took that step as a "gut check" because he wanted to ensure himself that he was not being overly critical of Lubin's performance. (*Id.*)   Greathouse's colleagues confirmed that Lubin was "not performing up to par." (*Id.* at 90, PageID.304.)   Even though Greathouse's colleagues believed that he was treating Lubin fairly, Lubin disagreed "with [Greathouse's] feedback." (*Id.* at 186, PageID.303.)   He believed Greathouse was being too "picky" (*id.*), and he insisted that he had met "all of his goals." (Lubin Decl. at ¶¶ 5-11, ECF No. 21-2, PageID.461.)

After Lubin completed the first 30 days of the 2020 PIP, Greathouse concluded that Lubin was not making sufficient progress. (*See* Varela Decl. at ¶12, ECF No. 17-3, PageID.190.)   Greathouse then consulted with FCA Human Resources, and Human Resources Business Partner Laura Varela told Greathouse

that Lubin "was not required to continue the [2020] PIP for the full 90 days" because Lubin had not shown "satisfactory improvements following the [2019] PIP." (*Id.*) Greathouse then recommended that Lubin's employment be terminated, and Varela "concurr[ed]" with that recommendation. (*Id.*) FCA then fired Lubin. (*See id.*)

In the immediate aftermath of Lubin's firing, his job responsibilities were handled by Bregin (who, as described above, was a comparable age to Lubin). (*See* Lubin Dep. at 176-177, ECF No. 17-2, PageID.168.) After about a year, two younger employees assumed those duties as part of a "job share." (Greathouse Dep. at 201-202, ECF No. 17-2, PageID.331-332.)

## II

Lubin filed this employment discrimination action against FCA on December 9, 2020. (*See* Compl., ECF No. 1.) In Count I of the Complaint, Lubin brings an age discrimination claim under the ADEA. (*See id.* at ¶¶ 31-40, PageID.4-5.) In this Count, Lubin claims that his supervisors "systematically targeted" him based on his age. (*Id.* at ¶36, PageID.5.) More specifically, Lubin says that "while younger less experienced employees were being placed on assignments with more support and less stringent sales [goals]," he was "held to a higher sales standard" and placed on multiple performance improvement plans. (*Id.*)

8

In Count II of the Complaint, Lubin brings an age discrimination claim under the ELCRA. (*See id.* at ¶¶ 41-50, PageID.5-6.)  In many ways, this claim mirrors his ADEA age discrimination claim, but it adds a claim for hostile work environment that Lubin did not raise in his ADEA discrimination claim. (*See id.* at ¶48, PageID.6: "The unwelcomed conduct or communication was intended to or in fact did substantially interfere with [Lubin's] employment or created an intimidating, hostile, or offensive work environment as allege[d] throughout this complaint.")

Next, in Counts III and IV of the Complaint, Lubin brings retaliation claims under both the ADEA (Count III) and ELCRA (Count IV). (*See id.* at ¶¶ 51-71, PageID.6-9.)  In these Counts, Lubin says that after he complained about his "bias[ed] sales expectations […] as compared to the younger Senior Sales employees," his bosses began subjecting him to "several adverse employment actions" such as "criticizing [his] work performance," "giving [him] 'poor' performance reviews," and "terminating [his] employment." (*Id.* at ¶¶ 55-56, PageID.7.)

Finally, in Count V, Lubin says that his discharge violated Michigan public policy. (*See id.* at ¶¶ 72-76, PageID.9.)

FCA moved for summary judgment on April 29, 2022. (*See* Mot., ECF No. 17.)  FCA asks the Court to "grant its motion and dismiss [all of Lubin's] claims […] with prejudice." (*Id.*, PageID.120.)  Lubin opposes FCA's motion. (*See* Lubin

9

Resp., ECF No. 21.)  In addition, Lubin filed a motion to strike certain declarations that FCA attached to its reply brief, or, in the alternative, for leave to file a sur-reply addressing those declarations. (*See* Lubin Mot., ECF No. 24.)   The Court **TERMINATES** Lubin's motion as moot.  The Court held a hearing on FCA's summary judgment motion on January 19, 2023, and during that hearing, it provided Lubin's counsel a full opportunity to respond to the content of the declarations. Moreover, and in any event, the Court did not rely on any of the declarations included in FCA's reply brief when reaching its decision here.

### III

Under Federal Rule of Civil Procedure 56, a movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 312, 326-27 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56).  When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.*  But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52.

**IV**

**A**

The Court begins with Lubin's age discrimination claims.  Before turning to the merits, the Court must define the contours of those claims.  A plaintiff bringing an age discrimination claim under the ADEA or ELCRA can bring two types of claims: a "disparate treatment" claim and a "disparate impact" claim.  The Sixth Circuit has described the differences between these two types of claims as follows:

> "Disparate treatment" is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment.
>
> Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.

*Lyon v. Ohio Educ. Ass'n Professional Staff Union*, 53 F.3d 135, 138 (6th Cir. 1995) (discussing disparate treatment and disparate impact claims under the ADEA) (internal punctation omitted) (quoting *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15 (1977)).

Lubin contends that he is brining *both* a disparate treatment *and* a disparate impact claim.  But his Complaint plainly does not include a disparate impact claim. In order to plead a disparate impact claim, a plaintiff must allege the existence of an "employment practice" that is "facially neutral in [its] treatment of different groups but that in fact fall[s] more harshly on one group than another." *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 239 (2005). *See also Bacon v. Honda of America, Mnf.*, 370 F.3d 565, 576 (6th Cir. 2004) (explaining that a "[d]isparate impact analysis is used when an employer's facially neutral policy adversely affects a protected class").  Lubin has not done that.  He does not identify in his Complaint either a facially neutral policy or facts that could support a conclusion that that policy disproportionately affects persons in a legally protected group.

Indeed, Lubin's allegations fit solely and squarely into the disparate treatment framework.  As described above, Lubin repeatedly alleges that he was specifically targeted for mistreatment, *not* that he was affected by a facially neutral policy.  For instance, Lubin says that FCA deliberately "placed" him in a position in Indirect Purchasing that he was not qualified for; that his supervisors were "bias[ed] against him" in particular "because of his age"; and that he was "targeted" and "held to a higher sales standard" as compared to younger workers. (Compl. at ¶¶ 9-10, 22, 36, ECF No. 1, PageID.2-3, 5.)   These are quintessential examples of disparate *treatment*, not disparate impact.  And the Sixth Circuit has repeatedly held that these

12

kinds of disparate treatment allegations do not state a viable claim for disparate impact. For example, in *Gambill v. Duke Energy Corp.*, 456 F. App'x 578 (6th Cir. 2012), the court explained that the plaintiffs had failed "to plead [a] disparate impact" claim under the ADEA where the words 'disparate" or "impact' appear[ed] nowhere in [their] Second Amended Complaint, [where] plaintiffs did not raise the theory until they filed their opposition to summary judgment[,]" and where "at most [plaintiff's] factual allegations support[ed] a disparate treatment claim and not a disparate impact claim." *Id.* at 587. Likewise, in *Reminder v. Roadway Exp., Inc.*, 215 F. App'x 481 (6th Cir. 2007), the Sixth Circuit affirmed the dismissal of a disparate impact claim under the ADEA where the plaintiffs "allege[d] that the defendant terminated them on the basis of age" and did not assert that "the defendant's reduction in force was a neutral practice that merely resulted in a disproportional number of older employees being terminated." *Id.* at 485. For all of these reasons, Lubin has not stated a viable disparate impact claim in his Complaint.

At the hearing on FCA's motion, Lubin's counsel asked the Court for leave to amend to add a disparate impact claim in the event that the Court concluded that Lubin had failed to raise such a claim in the Complaint. But orally asking for leave to amend at a hearing is not an appropriate method to seek permission to amend. *See*, *e.g.*, *Begala v. PNC Bank, Ohio, Nat. Ass'n*, 214 F.3d 776, 783-84 (6th Cir. 2000) (explaining that a plaintiff's request to amend that is stated "almost as an

aside" and not by way of formal motion "is [] not a motion to amend"); *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444 (6th Cir. 2014) (same). Simply put, no proper request for leave to amend is pending before the Court. In fact, instead of seeking leave to amend his Complaint to add a claim for disparate impact discrimination, Lubin has now filed a second and separate action against FCA in which he asserts that claim. *See Lubin v. FCA US LLC*, E.D. Mich. Civil Action No. 23-10358.

## B

Having clarified that Lubin's only discrimination claims arise out of FCA's purported disparate treatment, the Court now turns to the merits of those claims.

Under the ADEA, it is unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Likewise, the ELCRA prohibits "discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of ... age[.]" Mich. Comp. Laws § 37.2202(1)(a). "ELCRA claims are analyzed under the same standards as federal ADEA claims." *Geiger v. Tower Automotive*, 579 F.3d 614, 626 (6th Cir. 2009).

Where, as here, a plaintiff lacks direct evidence of discrimination, the plaintiff's age discrimination claims are governed by the framework first described

in *McDonnell Douglas v. Green,* 411 U.S. 792 (1973). *See Geiger*, 579 F.3d at 626 (applying *McDonell Douglas* framework to ADEA claim).   Under the *McDonnell Douglas* framework, Lubin has the initial burden to establish a *prima facie* case of age discrimination.   To do so, he must show that: "(1) he was at least at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was [either] replaced by a younger worker" or treated less favorably than a similarly-situated non-protected worker. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521-22 (6th Cir. 2008).   If Lubin establishes his *prima facie* case, the burden then shifts to FCA to put forth evidence of a legitimate, non-discriminatory reason for the adverse employment action. *See id.* at 521. If FCA provides such a reason, the burden shifts back to Lubin to show "*both* that [FCA's] proffered reason was not the real reason for its action, *and* that [FCA's] real reason was unlawful [age discrimination]." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (emphasis in original). *See also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (explaining that "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason") (emphasis in original); *Lytle v. Malady*, 579 N.W.2d 906, 916 (Mich. 1998) (explaining that at the pretext stage, "mere disproof of an employer's proffered [legitimate] reason [for the adverse action] is insufficient

to survive summary [judgment], unless *such disproof also raises a triable question of [unlawful] motive, not mere falsity*") (emphasis added).[3]

While the *McDonnell Douglas* framework has the three components described above, a court may proceed directly to the pretext analysis and grant summary judgment in favor of a defendant where the plaintiff's evidence fails to create a material factual dispute as to whether the employer's proffered reason for firing him was a pretext for unlawful discrimination. *See, e.g.*, *Williams v. AT&T Mobility Svcs. LLC*, 847 F.3d 384, 396 (6th Cir. 2017) (where parties vigorously disputed whether plaintiff had established *prima facie* case of retaliation, the court "assumed without deciding that [the plaintiff had] established her *prima facie* case," "proceed[ed] directly to the question of pretext," and affirmed summary judgment against plaintiff on ground that plaintiff failed to show pretext); *Thomas v. Union Institute*, 98 F. App'x 462, 466 (6th Cir. 2004) (same).[4]  The Court follows that course of action here and moves directly to the pretext stage of the analysis.

---

[3] The quote from *Lytle* in text above comes from an Opinion joined by three Justices of the Michigan Supreme Court. Justice Brickley filed a separate Opinion in which he concurred in the portions of the plurality decision addressing the plaintiff's employment discrimination claims. *See Lytle*, 579 N.W.2d at 920 (Brickley, J.).

[4] *See also Town v. Michigan Bell Telephone Co.*, 568 N.W.2d 64, 70 (Mich. 1997) ("[P]resum[ing] that plaintiff has established a *prima facie* case" of age discrimination and "mov[ing]" directly to "plaintiff's evidence that the defendant's proffered nondiscriminatory reason is a pretext for discrimination").

Lubin insists that FCA's proffered reason for his firing – his poor performance – was a pretext for age discrimination. (*See* Lubin Resp., ECF No. 21, PageID.449-451.)  However, on the record before the Court, no reasonable jury could conclude that FCA's stated reason for firing Lubin was a pretext for age discrimination.  There simply is no evidence that Greathouse, Lubin's primary supervisor and key participant in the decision to fire Lubin, harbored any age-based animus.  And there is evidence to the contrary.  As described above, Greathouse supervised several employees who were the same age (or older) than Lubin, and who had the same Senior Buyer B role as Lubin, and Greathouse provided positive reviews and high PLM scores to those employees. (*See* Greathouse Dep. at 170-171, ECF No. 17-12, PageID.324.)  In addition, around the same time that he provided critical reviews to Lubin, Greathouse had several other supervisors at FCA review Lubin's work and/or PLM reviews so Greathouse could ensure himself he wasn't being too "picky." (*Id*. at 88-90, 132-133, 186-187, ECF No. 17-12, PageID.303-304, 314, 328.)  And those other supervisors, none of whom are alleged to have an age-based animus, confirmed for Greathouse that Lubin's work was not satisfactory. (*See id.*)  That is further evidence that the low evaluation scores Greathouse gave Lubin were not based on Lubin's age.  Moreover, Greathouse was not the only supervisor to give Lubin a poor rating/review.  Lubin had received a low PLM score from a different supervisor during his last year working in Mopar Purchasing, a year before he ever started

working for Greathouse. (*See* Lubin Dep. at 91, ECF No. 17-2, PageID.487.)  That too undercuts Lubin's theory that Greathouse's treatment of him had anything to do with age.  Finally, Lubin's own submitted evidence undermines his theory that the real reason FCA fired him was due to his age.  As noted above, in Hiatt's declaration, she said that another supervisor at FCA, MaryAnn Kirsch (who discussed Lubin's firing with Greathouse (*see* Greathouse Dep. at 22, ECF No. 17-12, PageID.287)), "did not like Mike Lubin" and was "trying to find a way to get rid of him." (Hiatt Decl. at ¶¶ 18-19, ECF No. 21-6, PageID.547.)  Thus, Lubin's own evidence suggests that to the extent he was targeted for any reason, that reason was based on a *personal* animus, not an animus motivated by his age.  The bottom line is that on this record, no reasonably jury could find that FCA's real reason for firing Lubin was because of his age.

For all these reasons, FCA is entitled to summary judgment on Lubin's ADEA age-discrimination claim and all portions of Lubin's ELCRA age-discrimination claim except for his hostile-work environment claim.

## V

The Court next turns to Lubin's hostile-work environment claim under the ELCRA.  In FCA's motion for summary judgment, FCA never addressed this component of Lubin's ELCRA claim.  Therefore, the Court **DENIES** FCA's motion

**WITHOUT PREJUDICE** to the extent that it seeks summary judgment on Lubin's hostile work environment claim under the ELCRA.

However, the Court will **GRANT** FCA leave to file a second motion for summary judgment directed at that claim. Allowing FCA to do so is appropriate because (1) it appears to the Court that FCA has a reasonable and good-faith basis on which to seek summary judgment on the claim and (2) allowing FCA to move for summary judgment on the claim may well enhance judicial efficiency. The Court emphasizes that it has made no final determination as to the viability of Lubin's hostile work environment claim. It concludes only FCA has a good-faith basis to seek summary judgment on that claim.

## VI

Next, the Court takes up Lubin's retaliation claims in Counts III and IV of his Complaint.[5] "The *McDonnell Douglas* framework governs claims of retaliation based on circumstantial evidence. To establish a *prima facie* case of retaliation, [Lubin] must show "(1) that he engaged in a protected activity; (2) that [FCA] had knowledge of his protected conduct; (3) that [FCA] took an adverse employment action towards [him]; and (4) that there was a causal connection between the

---

[5] Lubin's ADEA and ELCRA retaliation claims are examined under the same "general framework." *Mickey*, 516 F.3d at 523 n.2. However, "the standard for causation" is not necessarily the same under the ELCRA as it is under the ADEA. *Id.* That difference is not relevant to the Court's analysis here.

protected activity and the adverse employment action." *Mickey*, 516 F.3d at 523 (internal punctuation omitted).   If Lubin can establish a *prima facie* case of retaliation, "the burden shifts to [FCA] to articulate a nondiscriminatory reason for its actions." *Id.* at 526.   "If [FCA] articulates such a reason, [Lubin] may then show that the defendant's stated reason "is merely a pretext for discrimination." *Id.*

In FCA's motion, FCA directs its arguments only at the *prima facie* component of the *McDonell Douglas* framework.   It makes two primary arguments, and the Court will address each separately.

First, FCA says that Lubin cannot "satisfy his *prima facie* case because he cannot show that he engaged in protected activity." (Mot., ECF No. 17, PageID.116.) More specifically, FCA argues that prior to his termination, Lubin "never made a complaint of age discrimination" and "never told anybody in management at FCA that he thought that he was a victim of age discrimination." (*Id.*, PageID.117.)   FCA says that Lubin complained only that workers with less seniority – not younger workers – were being treated more favorably than him. (*See id.*, PageID.116-117.) But Lubin has presented evidence to the contrary.   In his sworn declaration, Lubin stated that in December 2019, he "complained" to his "supervisor, Mary Ann [Kirsch], that younger workers were being preferenced [sic] by the company, with a 2019 Accomplishments spreadsheet" that provided evidence of the positive work he had done for FCA. (Lubin Decl. at ¶19, ECF No. 21-2, PageID.462.)   Lubin further

insists that "[a]t that time, [he] also informed [Kirsch] that [he] believed that the younger employees were not held to the same standards as us older ones and that they should be." (*Id.* at ¶20, PageID.462.)  Lubin's sworn statements create a question of fact as to whether he engaged in protected conduct.

Second, FCA argues that "assuming *arguendo*" Lubin engaged in protected conduct, "Lubin cannot show a causal connection between his comments and the alleged adverse actions." (Mot., ECF No. 17, PageID.118.)  But this argument is not fully developed.  Indeed, FCA's entire substantive argument on this point is just a single sentence: "It is abundantly clear from the record that Lubin made his statements about being held to a performance standard that was too high for his purported lack of experience, in response to his getting a '4' PLM rating, being put on a PIP." (*Id.*)  And in Lubin's response to FCA's motion, he does not address this argument at all.  Because FCA's causation argument is not sufficiently developed and addressed in the briefing, the Court declines to grant summary judgment based upon the alleged lack of causation evidence.

The Court will therefore **DENY** FCA's motion **WITHOUT PREJUDICE** to the extent that it is directed at Lubin's retaliation claims.  However, the Court will permit FCA to again move for summary judgment on those claims when FCA files the second motion for summary judgment that the Court authorized FCA to file above.  When and if FCA renews its motion for summary judgment on Lubin's

retaliation claims, it shall apply the entire *McDonell Douglas* framework – including pretext – to those claims.

## VII

In Count V of his Complaint, Lubin says that he was fired in violation of Michigan public policy.  More specifically, Lubin says that FCA violated Michigan public policy when they purportedly discharged him "as a result of him refusing to sign for a document from Human Resources that would force him to waive his rights to engage in protected activities in order to receive a position that he was rightfully entitled." (Compl. at ¶74, ECF No. 1, PageID.9.)   FCA moved for summary judgment on this Count (*see* Mot., ECF No. 17, PageID119), and Lubin never responded.  The Court therefore considers the claim abandoned.  *See Clark v. City of Dublin*, 178 F. App'x 522, 524-25 (6th Cir. 2006) (recognizing that the failure to respond properly to summary judgment arguments constitutes abandonment of a claim); *Conner v. Hardee's Food Sys.*, 65 F. App'x 19, 24-25 (6th Cir. 2003) (same). Moreover, Lubin admitted at his deposition that FCA never asked him to "sign some sort of waiver" and that he was "not certain how that [claim] got in [his Complaint]." (Lubin Dep. at 208-209, ECF No. 17-1, PageID.176.)

For all of these reasons, FCA is entitled to summary judgment on Lubin's public policy claim.

## VIII

Finally, in his response to FCA's summary judgment motion, Lubin said that the Court should not grant FCA's motion because he needed additional discovery in order to fully respond to FCA's arguments. More specifically, Lubin said he needed the PLM "ratings and ages" of Lubin's "comparators" at FCA and "their bases for either retention or termination." (Lubin Resp., ECF No. 21, PageID.443. *See also* Rule 56(d) Declaration, ECF No. 18.) It was not entirely clear to the Court what documents Lubin claimed he needed, so the Court provided Lubin's counsel the opportunity to clarify that issue at the hearing. None of the materials that Lubin identified (either in the declaration from his lawyer and/or on the record in open court) are relevant to the bases upon which the Court has granted FCA's motion in part. Thus, the Court may properly grant partial summary judgment notwithstanding that Lubin claims not to have the materials he identified.

## IX

For all of the reasons explained above, FCA's motion for summary judgment (ECF No. 21) is **GRANTED IN PART AND DENIED WITHOUT PREJUDICE IN PART** as follows:

- The motion is **GRANTED** with respect to Count I (age discrimination under the ADEA);

- The motion is **GRANTED** as to all potions of Count II (age discrimination under the ELCRA) *except* for Lubin's hostile work environment claim.  The motion is **DENIED WITHOUT PREJUDICE** with respect to that claim;

- The motion is **DENIED WITHOUT PREJUDICE** as to Counts III and IV (retaliation under the ADEA and ELCRA); and

- The motion is **GRANTED** with respect to Count V (termination in violation of Michigan public policy).

In addition, Lubin's request for additional discovery under Federal Rule of Civil Procedure 56(d) is **DENIED** and his motion to strike (ECF No. 24) is **TERMINATED AS MOOT**.

Finally, the Court **GRANTS** FCA leave to file a second summary judgment motion directed at (1) Lubin's hostile work environment claim under the ELCRA and (2) Lubin's retaliation claims.  FCA shall file that motion by **not later than March 17, 2023**.

      **IT IS SO ORDERED.**

      s/Matthew F. Leitman
      MATTHEW F. LEITMAN
      UNITED STATES DISTRICT JUDGE

Dated:  February 15, 2023

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 15, 2023, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126