UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL LUBIN,

    Plaintiff,

v.

FCA US, LLC,

    Defendant.

Case No. 20-cv-13233
Hon. Matthew F. Leitman

_____/

## ORDER GRANTING DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT (ECF No. 33)

In this action, Plaintiff Michael Lubin claims that his former employer, FCA US, LLC, discriminated against him based on his age, retaliated against him for raising concerns about how he was treated, and subjected him to a hostile work environment. The Court previously granted FCA summary judgment on most of Lubin's claims. (*See* Order, ECF No. 30.)

FCA has now moved for summary judgment on Lubin's remaining claims: (1) that FCA retaliated against him in violation of state and federal law after he raised concerns that he was being discriminated against based on his age (the "Retaliation Claims") and (2) that FCA subjected him to a hostile work environment based on his age in violation of state law (the "Hostile Work Environment Claim"). (*See* Mot., ECF No. 33.) For the reasons explained below, FCA's motion is **GRANTED**.

1

# I

## A

The Court previously described the factual background of this action in detail (*see* Order, ECF No. 30, PageID.638-644), and it incorporates that recitation here. In short, FCA hired Lubin in 1997 as a "hi-lo supervisor." (Lubin Dep. at 40, ECF No. 17-2, PageID.134.) Over the next several years, Lubin held a variety of positions at FCA. (*See*, *e.g.*, *id.* at 41-45, PageID.134-135.)

At all relevant times, FCA evaluated management-level employees like Lubin, in part, by assigning each employee a "rating" that took into consideration an employee's "performance and leadership skills." (Declaration of Laura Varela, FCA Human Resources Business Partner, at ¶8, ECF No. 17-3, PageID.188.) A "1," "2," or "4" rating on FCA's scoring matrix were the "lowest scores." (*Id.*) In 2017, for the first time, Lubin received a "4" (*i.e.*, poor) rating. (*See* Lubin Dep. at 91, ECF No. 17-2, PageID.487.)

Lubin thereafter transferred to the "Indirect Purchasing" department within FCA. (*Id.* at 27, 121, PageID.131, 155.) Not long after he started in Indirect Purchasing, Lubin began reporting to a new supervisor: Jim Greathouse. (*See id.* at 18, 121, PageID.129, 154.)

Lubin's transition to Indirect Purchasing was challenging. In his 2018 annual review, Greathouse gave Lubin a "4" rating on FCA's rating matrix – Lubin's second consecutive poor rating. (*See* 2018 Review, ECF No. 17-13, PageID.336.) In Lubin's review, Greathouse wrote that certain strategy presentations were "not complete," "sloppy," and "missing information." (*Id.*) Lubin also received a "low" rating for "overall leadership." (*Id.*)

On May 8, 2019, Greathouse placed Lubin on a 90-day "Performance Improvement Plan" (the "2019 PIP"). (*See* 2019 PIP, ECF No. 17-14.) The 2019 PIP was "initiated" because Lubin had failed to "meet all of his performance or leadership objectives" for 2018. (*Id.*, PageID.341.) Lubin completed the 2019 PIP in October 2019. At that time, Greathouse concluded that Lubin had "taken the [2019] PIP seriously," had "ma[de] an effort to improve," and "met the minimum requirement[s]" for his position. (*Id.*, PageID.350-351.) Nonetheless, Greathouse also noted that Lubin was "not happy with his current role," and Greathouse was skeptical that Lubin could "sustain[]" his improvement. (*Id.*)

Lubin maintains that he did want to improve, but neither Greathouse nor any other supervisor at FCA was willing to help him or provide him feedback. (*See* Lubin Dep. at 183-185, ECF No. 17-2, PageID.170. *See also* Lubin Decl. at ¶18, ECF No. 38-1, PageID.759.) More specifically, Lubin says when he asked Greathouse for help, Greathouse dismissed those requests by saying that "this is purchasing 101"

and that Lubin was performing the "lowest of the low … the bare minimum that was expected." (Lubin Resp. to Interrog., ECF No. 17-17, PageID.380. *See also* Lubin Dep. at 139-140, ECF No. 17-2, PageID.159.)  Lubin also claims that Greathouse would "take over" his computer and start "fixing things he didn't like." (Lubin Dep. at 140, ECF No. 17-2, PageID.159.)  Finally, Lubin asserts that he was told that he "was expected to perform better" because he had more experience than other workers in his department. (Lubin Decl. at ¶16, ECF No. 38-1, PageID.758. *See also* Lubin Resp. to Interrog., ECF No. 17-17, PageID.380.)

In December 2019, Lubin complained to one of his supervisors, MaryAnn Kirsch, "that younger workers were being preferred by the company" and "younger employees were not being held to the same standards as us older ones." (Lubin Decl. at ¶¶ 19-20, ECF No. 38-1, PageID.759.)  Lubin says that "[t]o [his] knowledge, [his] complaints were] not investigated." (*Id.* at ¶21, PageID.759.)

Three months later, Lubin received another "4" rating from Greathouse during his 2019 annual review. (*See* ECF 2019 Review, No. 17-16, PageID.360.) Greathouse then placed Lubin into a second Performance Improvement Plan (the "2020 PIP"). (*See* Greathouse Dep. at 185-186, ECF No. 17-12, PageID.327-328; Varela Decl. at ¶12, ECF No. 17-3, PageID.190.)  Around this same time, Greathouse had several colleagues review Lubin's work and annual evaluations. (*See* Greathouse Dep. at 88-90, 132-133, 186-187, ECF No. 17-12, PageID.303-304,

4

314, 328.) Greathouse took that step as a "gut check" because he wanted to ensure himself that he was not being overly critical of Lubin's performance. (*Id.*) Greathouse's colleagues confirmed that Lubin was "not performing up to par." (*Id.* at 90, PageID.304.) Even though Greathouse's colleagues believed that he was treating Lubin fairly, Lubin disagreed "with [Greathouse's] feedback." (*Id.* at 186, PageID.328.) He believed Greathouse was being too "picky" (*id.*), and he insisted that he had met "all of his goals." (Lubin Decl. at ¶¶ 5-11, ECF No. 21-2, PageID.461.)

After Lubin completed the first 30 days of the 2020 PIP, Greathouse concluded that Lubin was not making sufficient progress. (*See* Varela Decl. at ¶12, ECF No. 17-3, PageID.190.) Greathouse then consulted with FCA Human Resources Business Partner Laura Varela. Varela told Greathouse that Lubin "was not required to continue the [2020] PIP for the full 90 days" because Lubin had not shown "satisfactory improvements following the [2019] PIP." (*Id.*) Greathouse then recommended that Lubin's employment be terminated, and Varela "concurr[ed]" with that recommendation. (*Id. See also* Greathouse Dep. at 22, ECF No. 17-12, PageID.287.) FCA then fired Lubin. (*See id.*)

## II

Lubin filed this employment discrimination action against FCA on December 9, 2020. (*See* Compl., ECF No. 1.) Lubin brought five claims against FCA:

5

- In Count 1, Lubin bought an age discrimination claim under the federal Age Discrimination in Employment Act, 29, U.S.C. § 621 (the "ADEA");

- In Count 2, Lubin brought an age discrimination claim and hostile work environment claim under Michigan's Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.* (the "ELCRA");

- In Count 3, Lubin brought a retaliation claim under the ADEA;

- In Count 4, Lubin brought a retaliation claim under the ELCRA; and

- In Count 5, Lubin said that his discharge violated Michigan public policy.

FCA moved for summary judgment on April 29, 2022. (*See* Mot., ECF No. 17.) The Court held a hearing on the motion, and, on February 15, 2023, it issued a written order granting the motion in part and denying the motion in part. (*See* Order, ECF No. 30.) More specifically, the Court granted the motion with respect to Lubin's age discrimination claims under the ADEA (Count 1) and ELRCA (Count 2) and Lubin's public policy claim (Count 5). But it denied the motion without prejudice with respect to the Retaliation Claims (Counts 3 and 4). The Court explained that FCA was not entitled to summary judgment on the Retaliation Claims because FCA had not fully developed and presented its argument on those Counts. (*See id.*, PageID.657-658.) In addition, the Court declined to grant FCA summary judgment on the Hostile Work Environment Claim included in Count 2 of Lubin's Complaint because FCA "never addressed [that] component of Lubin's ELCRA

6

claim" in its briefing. (*Id.*, PageID.654.)  Finally, the Court granted FCA leave to file a second summary judgment motion addressing the Retaliation Claims and the Hostile Work Environment Claim. (*See id.*, PageID.655, 657-658.)

FCA filed its second summary judgment on March 18, 2023. (*See* Mot., ECF No. 33.)  The Court concludes that it may resolve the motion without oral argument. (*See* Notice of Determination Without Oral Argument, ECF No. 42.)

### III

FCA moves for summary judgment under Federal Rule of Civil Procedure 56. Under that rule, a movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 312, 326-27 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56).  When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.*  But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52.

7

IV

A

The Court begins with the Retaliation Claims. These claims are governed by the framework first described in *McDonnell Douglas v. Green,* 411 U.S. 792 (1973). *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008) ("The *McDonnell Douglas* framework governs claims of retaliation based on circumstantial evidence").[1] "To establish a *prima facie* case of retaliation, [Lubin] must show (1) that he engaged in a protected activity; (2) that [FCA] had knowledge of his protected conduct; (3) that [FCA] took an adverse employment action towards [him]; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Id.* (internal punctuation omitted). In general, "[t]he burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Id.*

If Lubin can establish a *prima facie* case of retaliation, "the burden shifts to [FCA] to articulate a nondiscriminatory reason for its actions." *Id.* at 526. "If [FCA] articulates such a reason, [Lubin] may then show that [FCA's] stated reason is merely a pretext for discrimination." *Id.* (internal quotation marks omitted). "Under

---

[1] Lubin's ADEA and ELCRA retaliation claims are examined under the same "general framework." *Mickey*, 516 F.3d at 523 n.2. However, "the standard for causation" is not necessarily the same under the ELCRA as it is under the ADEA. *Id.* That difference is not relevant to the Court's analysis here.

the law of our circuit, a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). These categories are "a convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer fire the employee for the stated reason or not? As [the Sixth Circuit] ha[s] stated, at bottom the question is always whether the employer made up its stated reason to conceal intentional [retaliation]." *Id.* (internal quotation marks omitted).

## B

While a plaintiff's *prima facie* burden is ordinarily not difficult to meet, Lubin has not cleared that bar here. More specifically, Lubin has not established the required causal link between his protected activity and the claimed adverse actions FCA took against him.

Lubin argues that he can establish the required causal connection through temporal proximity. According to Lubin, he complained to Kirsch in December 2019 that younger workers were being treated better than older workers, and he says that just three months later, he was placed on the 2020 PIP and then fired. Lubin insists that "[t]here months is not of such an extreme temporal gap as to make the events unrelated, and there is no other reason" that Greathouse would have instituted

9

the 2020 PIP other than to retaliate for Lubin's complaint to Kirsch. (Lubin Resp., ECF No. 38, PageID.753.)

The problem with Lubin's temporal proximity argument is that his poor reviews did not start after his complaint to Kirsch. Indeed, as explained in detail above (and in the Court's February 15 order), Lubin received his first poor rating during his 2017 annual review, years before his complaint to Kirsch. Likewise, Greathouse first gave Lubin a poor review and placed Lubin on the 2019 PIP more than six months before Lubin lodged any complaint with FCA regarding alleged age-based mistreatment. Simply put, Greathouse's placement of Lubin on the 2020 PIP was the continuation of a course of conduct – expressing significant concerns about Lubin's unsatisfactory performance and taking actions to address that poor performance – that began long before Lubin engaged in his purported protected conduct. Thus, the fact that the 2020 PIP was instituted three months after Lubin engaged in that conduct does not support an inference that the conduct caused the PIP. *See Greiner v. Charter Cty. of Macomb*, 2017 WL 5289499, at *3 (E.D. Mich. Nov. 13, 2017) (collecting cases and explaining that "numerous federal courts have held that temporal proximity, alone, does not establish causation where the employer commenced substantial disciplinary proceedings *before* the employee engaged in the protected conduct") (emphasis in original); *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 95 (2nd Cir. 2001) (affirming summary judgment on

retaliation claim and noting that "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise").

Lubin cannot show causation for a second reason: he has not cited any evidence that person who was the moving force behind his termination – Greathouse –knew that he (Lubin) engaged in protected conduct. As explained above, Greathouse sought Lubin's termination in May 2020. But Lubin has not directed the Court to any evidence that when Greathouse did so, Greathouse was aware that Lubin had complained to Kirsch months earlier about alleged age-based mistreatment at FCA. Because Lubin has failed to cite evidence that Greathouse had knowledge of his (Lubin's) protected conduct, Lubin cannot show that his engaging in that conduct caused his discharge. The Retaliation Claims therefore fail at the *prima facie* stage for this additional reason.

Finally, even if Lubin had satisfied his *prima facie* burden, for all of the reasons explained in the Court's February 15 order with respect to his discrimination claims, Lubin has not shown that that FCA's proffered reason for firing him – his poor performance – was a pretext for unlawfully terminating his employment. (*See* Order, ECF No. 30, PageID.653-654.) This is yet another reason that FCA is entitled to summary judgment on Lubin's Retaliation Claims.

## C

Finally, the Court turns to the Hostile Work Environment Claim. To establish such a claim under the ELCRA, a plaintiff must satisfy the following elements:

> (1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of the protected status; (3) the employee was subjected to unwelcome conduct or communication on the basis of the protected status; (4) the unwelcome conduct or communication was intended to, or in fact did, interfere substantially with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior.

*Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 468 (6th Cir. 2009) (quoting *Downey v. Charlevoix County Bd. of Rd. Comm'rs*, 576 N.W.2d 712, 716 (Mich. App. 1998)). "Whether a hostile work environment existed shall be determined by whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Id.* (quoting *Radtke v. Everett*, 501 N.W.2d 155, 167 (Mich. 1993)). "Relevant circumstances 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Mayville v. Ford Motor Co.*, 2006 WL 3040672, at \*3 (Mich. Ct. App. Oct. 26, 2006). "The question of whether

conduct is severe or pervasive is quintessentially a question of fact." *Id.* (internal citation omitted).

The Hostile Work Environment Claim fails here because Lubin has not produced evidence that the alleged hostility he claimed to have experienced had anything to do with his age. Indeed, while Lubin says that Greathouse repeatedly berated his work, Lubin has not identified any specific comment that Greathouse made that referred – even indirectly – to Lubin's age. Instead, Lubin explained in his discovery responses that:

> I had no support from Jim, who also didn't know how to do certain things in Indirect because his background was Direct Purchasing. He frequently dismissed my requests for assistance with "this is purchasing 101" statements. At one point he told me that my accomplishments in Indirect brought me to a point where I was the "lowest of the low...the bare minimum that was expected", despite my statistically undeniable accomplishments and my heavier workload.

(Lubin Discovery Resp., ECF No. 17-17, PageID.380.) Lubin expanded upon these comments from Greathouse at his deposition:

> So [were my reports] to [Greathouse's] liking? Probably not, but you got to remember too, he came from production engineer--or production purchasing where they did these all the time, and he would make references many times to, Mike, this is purchasing 101. You know, and he would take over my computer, and start banging on the computer and fixing things that he didn't like.

13

(Lubin Dep. at 139-140, ECF 17-2, PageID.159.)  Lubin simply has not tied any of these comments or actions by Greathouse to his age.  Lubin also says that he was subjected to higher standards than his co-workers because he had more experience than them. (*See*, *e.g.*, Lubin Discovery Resp., ECF No. 17-17, PageID.380.)  But again, Lubin has not shown that to the extent he was held to a higher standard, it was *because of* his age.

In Lubin's response to FCA's motion for summary judgment, Lubin seems to suggest that the experiences of two other FCA workers – Kevin Bentley and Leticia Jauregui – helps to prove that the hostility he allegedly experienced was due to his age.  But he has not shown how their circumstances support his claim that he suffered age-based harassment.  He insists that Bentley and Jauregui "suffered discrimination on the basis of age" when they received negative performance reviews based upon their ages. (Lubin Resp., ECF No. 38, PageID.749.)  But Lubin has not shown how their negative reviews shed any meaningful light on whether *he* was the victim of age-based hostility.  Indeed, as FCA points out, Jauregui never worked in Indirect Purchasing (where Lubin claims to have suffered age-based hostility), and Bentley did not work under Greathouse (who allegedly directed the age-based hostility toward Lubin). (*See* FCA Reply Br., ECF No. 39, PageID.901.)  Furthermore, Lubin has not produced any evidence *from* Bentley or Jauregui that could establish that they were subjected to a sufficiently hostile work environment based on their age.

14

Instead, as Lubin admitted at his deposition, all he could say is that Bentley and Jauregui told him that they thought their negative reviews were "potentially age related." (Lubin Dep. at 20-22, ECF No. 17-2, PageID.129-130.) Such hearsay speculation falls short of establishing that Bentley and Jauregui experienced pervasive age-based hostility. And without evidence that they experienced such hostility, Lubin has no basis for his contention that their experiences support his claim that *he* suffered severe age-based hostility.

Finally, Lubin contends in his summary judgment response brief that one portion of his deposition testimony provides evidence that he experienced age-based hostility. But the testimony in question lends no support to Lubin's claim that he experienced age-based hostility from Greathouse while working in Indirect Purchasing. According to Lubin, in the testimony at issue, he mentioned a "'recurring theme lately over the past couple of years [at FCA]' where older employees were referred or suggested to as lacking the energy to deliver." (Lubin Resp., ECF No. 38, PageID.749, quoting Lubin Dep. at 73-74, ECF No. 17-2, PageID.142.) But that testimony appears to be referring to the environment at FCA in the 2013-2015 time period, *not* the time period that is relevant here. (*See id*.) Moreover, contrary to the description in his response brief, Lubin never actually testified that any FCA employee ever "referred" or "suggested" that older employees "lack[ed] the energy to deliver." And Lubin admitted that he did not know whether

15

his musings about "energy" provided any evidence of age-based hostility.  Lubin's testimony was: "I do notice though that the energy is a way of life, as far as the energy to deliver seems to be a recurring theme lately, over the past couple years in there.  I don't know.  But I do think – so my point of that is that maybe that's age related.  But maybe not; I don't know." (Lubin Dep. at 73-74, ECF No. 17-2, PageID.142-143.)  For all of these reasons, Lubin's testimony about "energy" does not create a material factual dispute as to whether he experienced pervasive age-based hostility.

FCA is therefore entitled to summary judgment on the Hostile Work Environment Claim.

**V**

For all of the reasons explained above, FCA's motion for summary judgment (ECF No. 33) is **GRANTED**.

**IT IS SO ORDERED.**

Dated:  September 26, 2023

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 26, 2023, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126

16